No. 26-1640

In the United States Court of Appeals
for the Fourth Circuit

WHB 823,

*Plaintiff-Appellee,*

v.

UBER TECHNOLOGIES, INC., et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of North Carolina

# AMICUS BRIEF OF THE STATE OF NORTH CAROLINA IN SUPPORT OF PLAINTIFF-APPELLEE AND IN SUPPORT OF AFFIRMANCE


JEFF JACKSON
Attorney General

Nicholas S. Brod
Solicitor General

Taylor Brennan
Solicitor General Fellow

North Carolina Department of Justice
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

*Counsel for Amicus Curiae State of North Carolina*

## TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES .......... iii

INTRODUCTION .......... 1

INTEREST OF THE AMICUS .......... 2

ARGUMENT .......... 2

I. Uber Is A Common Carrier Under North Carolina Law. .......... 2

A. Uber holds itself out to the public as a transportation provider. .......... 4

B. Uber is a "carrier" under North Carolina law. .......... 5

C. Uber offers its services indifferently to the public. .......... 8

D. Uber offers transportation on a uniform tariff. .......... 12

II. North Carolina Statutes Do Not Displace The Common Law Governing Common Carriers' Tort Duties. .......... 17

A. The TNC statute does not displace the common law because it says nothing about the common law. .......... 17

B. Separate regulatory treatment of statutorily defined "common carriers" says nothing about common law duties of care. .......... 20

III. Under North Carolina Law, Common Carriers Are Liable For Harms To Passengers Caused By The Intentional Torts Of Their Independent Contractors. .......... 24

A. A common carrier's nondelegable duty to provide safe transport does not depend on a public franchise. .......... 25

B. A common carrier's duty to its passengers cannot be delegated to independent contractors .......... 28

CONCLUSION ........................................................................................ 32
CERTIFICATE OF COMPLIANCE
CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Am. Orient Exp. Ry. Co. v. Surface Transp. Bd.*,
484 F.3d 554 (D.C. Cir. 2007) ........................................ 6, 16

*Bank of Ky. v. Adams Express Co.*,
93 U.S. 174 (1876) ........................................ 7

*Briscoe v. Henderson Lighting & Power Co.*,
62 S.E. 600 (N.C. 1908) ........................................ 2

*Brooks v. BCF Piping, Inc.*,
426 S.E.2d 282 (N.C. Ct. App. 1993) ........................................ 26

*Capriole v. Uber Techs., Inc.*,
991 F.3d 339 (1st Cir. 2021) ........................................ 12

*Claypool v. Lightning Delivery Co.*,
299 P. 126 (Ariz. 1931) ........................................ 10, 11

*Connell v. Call-A-Cab, Inc.*,
937 So. 2d 71 (Ala. 2006) ........................................ 25

*Crawford v. Uber Techs., Inc.*,
2021 WL 3810259 (N.D. Cal. Aug. 26, 2021) ........................................ 5, 6, 8

*Daniel v. Petersburg R. Co.*,
23 S.E. 327 (N.C. 1895) ........................................ 27

*Derwort v. Loomer*,
21 Conn. 245 (Conn. 1851) ........................................ 27

*Dickson v. Rucho*,
737 S.E.2d 362 (N.C. 2013) ........................................ 18

*Dockery v. World of Mirth Shows, Inc.*,
142 S.E.2d 29 (N.C. 1965) ........................................ 26

*Doe A.F. v. Lyft, Inc.*,
2024 WL 3497886 (E.D. Pa. July 19, 2024) ........................................ 20

*Drammeh v. Uber Techs., Inc.*,
2024 WL 4003548 (9th Cir. Aug. 30, 2024) ........................................ 6

*Equal Rts. Ctr. v. Uber Techs., Inc.*,
525 F. Supp. 3d 62 (D.D.C. 2021) .......................................................... 7

*Flytenow, Inc. v. F.A.A.*,
808 F.3d 882 (D.C. Cir. 2015) ............................................................... 9

*Fortson v. McClellan*,
508 S.E.2d 549 (N.C. Ct. App. 1998) ..................................................... 8

*Griffin v. Goldsboro Water Co.*,
30 S.E. 319 (N.C. 1898) ........................................................................ 16

*Hairston v. Atl. Greyhound Corp.*,
18 S.E.2d 166 (N.C. 1942) ............................................................. 24, 30

*Hardy v. Ingram*,
126 S.E.2d 55 (N.C. 1962) ............................................................... 4, 22

*Hendricks v. Leslie Fay, Inc.*,
159 S.E.2d 362 (N.C. 1968) ....................................................... 26, 28, 30

*Hill v. Carolina Freight Carriers Corp.*,
71 S.E.2d 133 (N.C. 1952) ...................................................................... 8

*Hoffman v. Silverio-Delrosar*,
2021 WL 2434064 (D.N.J. June 15, 2021) ............................................ 24

*Hoffman v. Silverio-Delrosar*,
2021 WL 6091107 (D.N.J. Dec. 23, 2021) .............................................. 9

*Hollingsworth v. Skelding*,
55 S.E. 212 (N.C. 1906) ........................................................................ 31

*Home Ins. Co. v. Riddell*,
252 F.2d 1 (5th Cir. 1958) ............................................................. 13, 15

*Hough-Wylie Co. v. Lucas*,
72 S.E.2d 11 (N.C. 1952) ....................................................................... 22

*In re Grice*,
974 F.3d 950 (9th Cir. 2020) .................................................................. 4

*In re Uber Techs., Inc., Passenger Sexual Assault Litig.*,
745 F. Supp. 3d 869 (N.D. Cal. 2024) .................................................. 20

*Interstate Com. Comm'n v. Balt. & Ohio R.R. Co.*,
145 U.S. 263 (1892) .......... 14

*Jackson v. Stancil*,
116 S.E.2d 817 (N.C. 1960) .......... passim

*Lamb v. B & B Amusements Corp.*,
869 P.2d 926 (Utah 1993) .......... 27

*Lambeth v. N.C. R.R. Co.*,
66 N.C. 494 (N.C. 1872) .......... 27

*Loggins v. S. Pub. Utils. Co.*,
106 S.E. 822 (N.C. 1921) .......... 22

*Lowe v. Harris*,
17 S.E. 539 (N.C. 1893) .......... 18

*Mann v. Va. Dare Transp. Co.*,
198 S.E.2d 558 (N.C. 1973) .......... 24, 25, 28, 29, 31

*Medley v. N.C. Dep't of Corr.*,
412 S.E.2d 654 (N.C. 1992) .......... 26, 30

*Mo. Pac. R. Co. v. Larabee Flour Mills Co.*,
211 U.S. 612 (1909) .......... 16

*Mount Pleasant Indep. Sch. Dist. v. Est. of Lindburg*,
766 S.W.2d 208 (Tex. 1989) .......... 27

*Munn v. Illinois*,
94 U.S. 113 (1876) .......... 15, 26, 27

*Murray v. Uber Techs., Inc.*,
486 F. Supp. 3d 468 (D. Mass. 2020) .......... 7, 24

*Namisnak v. Uber Techs., Inc.*,
444 F. Supp. 3d 1136 (N.D. Cal. 2020) .......... 5

*Nelson v. Freeland*,
507 S.E.2d 882 (N.C. 1998) .......... 3

*O'Connor v. Uber Techs., Inc.*,
82 F. Supp. 3d 1133 (N.D. Cal. 2015) .......... 8

*Page v. Sloan*,
190 S.E.2d 189 (N.C. 1972) ... 26, 28

*People v. Uber Techs., Inc.*,
270 Cal. Rptr. 3d 290 (Cal. Ct. App. 2020) ... 5

*Price v. Edwards*,
101 S.E. 33 (N.C. 1919) ... 18

*Pride v. Piedmont & N. Ry. Co.*,
97 S.E. 418 (N.C. 1918) ... 29

*Smith v. Goforth*,
209 S.E.2d 887 (N.C. Ct. App. 1974) ... 5

*State ex rel. N.C. Utils. Comm'n v. McKinnon*,
118 S.E.2d 134 (N.C. 1961) ... 23

*State ex rel. Utils. Comm'n v. Am. Courier Corp.*,
174 S.E.2d 814 (N.C. Ct. App. 1970) ... 12

*State ex rel. Utils. Comm'n v. Bird Oil Co.*,
273 S.E.2d 232 (N.C. 1981) ... 14, 15, 16

*State ex rel. Utils. Comm'n v. Gulf-Atl. Towing Corp.*,
110 S.E.2d 886 (N.C. 1959) ... 9, 11, 13, 14

*State ex rel. Utils. Comm'n v. Simpson*,
246 S.E.2d 753 (N.C. 1978) ... 10

*State ex rel. Utils. Comm'n v. Tar Heel Indus., Inc.*,
334 S.E.2d 396 (N.C. Ct. App. 1985) ... 13, 16

*Story v. Norfolk & S.R. Co.*,
45 S.E. 349 (N.C. 1903) ... 11

*Terminal Taxicab Co. v. Kutz*,
241 U.S. 252 (1916) ... 10, 11

*Terry v. Pub. Serv. Co. of N.C., Inc.*,
898 S.E.2d 648 (N.C. 2024) ... 17

*White v. Chappell*,
14 S.E.2d 843 (N.C. 1941) ... 31

*Wilson v. Shulkin*,
51 N.C. 375 (1859) .......... 23

*Woods v. N.C. Pub. Serv. Co.*,
94 S.E. 459 (N.C. 1917) .......... 22

*Woodson v. Rowland*,
407 S.E.2d 222 (N.C. 1991) .......... 26

*York Co. v. Cent. R.R.*,
70 U.S. 107 (1865) .......... 16

**North Carolina Statutes**

N.C. Gen. Stat. § 20-280.1(6) .......... 18, 19

N.C. Gen. Stat. § 20-280.2(a)(1) .......... 18

N.C. Gen. Stat. § 20-280.3 .......... 18

N.C. Gen. Stat. § 20-280.4 .......... 18

N.C. Gen. Stat. § 20-280.5(a) .......... 18

N.C. Gen. Stat. § 20-280.5(b) .......... 18

N.C. Gen. Stat. § 20-280.6 .......... 19

N.C. Gen. Stat. § 20-280.7 .......... 19

N.C. Gen. Stat. § 20-280.8 .......... 19

N.C. Gen. Stat. § 20-280.9 .......... 19

N.C. Gen. Stat. § 20-280.10 .......... 19

N.C. Gen. Stat. §§ 20-280.1 to -280.10 .......... 17

N.C. Gen. Stat. § 62-2(b) .......... 21

N.C. Gen. Stat. § 62-3(6) .......... 22

N.C. Gen. Stat. § 62-139 .......... 21

N.C. Gen. Stat. § 62-259 .......... 21

N.C. Gen. Stat. § 62-260(a)(2) .......... 22

N.C. Gen. Stat. § 62-260(a)(5) .......... 22

N.C. Gen. Stat. § 62-262(a) .......... 21

N.C. Gen. Stat. § 62-262(e) .......... 21
N.C. Gen. Stat. § 62-262.1 .......... 21
N.C. Gen. Stat. § 62-268 .......... 21
N.C. Gen. Stat. § 62-273.1 .......... 21
N.C. Gen. Stat. §§ 62-1 to -352 .......... 17, 21
N.C. Gen. Stat. §§ 62-259 to -289 .......... 21
N.C. Gen. Stat. § 160A-304 .......... 23
N.C. Gen. Stat. § 160A-685(c)(18) .......... 23
N.C. Gen. Stat. § 160A-686(b) .......... 23

**Other Statutes**

Fla. Stat. § 627.748(2) .......... 20
66 Pa. Cons. Stat. § 2603(a) .......... 20
66 Pa. Cons. Stat. § 2603(b)(4) .......... 20
Tex. Occ. Code § 2402.002 .......... 20

**Session Law**

Bus Act of 1949, ch. 1132, 1949 N.C. Sess. Laws 1325 .......... 22

**Rule**

Fed. R. App. P. 29(a)(2) .......... 2

## INTRODUCTION

For all practical purposes, Uber is a taxi company that connects drivers and riders through an app. Under North Carolina law, taxis are common carriers, and common carriers are liable for harms to passengers that their independent contractors cause. Well-established North Carolina common law principles thus resolve this case.

Uber seeks a bespoke exception to these principles, asking this Court to relieve it of its tort duties as a common carrier, including its duty to protect the plaintiff here from sexual assault by an Uber driver. But only an unambiguous statute can displace the ordinary common law rules that govern Uber's conduct. And Uber can point to no such statute. Uber is not exempt from tort liability merely because its riders hail drivers from an app rather than from the street.

Companies like Uber provide millions of rides to people across North Carolina. Under Uber's proposed rule, North Carolinians would have no meaningful remedy for sexual assaults and other intentional torts committed by rideshare drivers. If the people of North Carolina wish to surrender their ability to recover from Uber when Uber drivers assault them, they can do so by speaking clearly through their elected

representatives in the state legislature. This Court should not make that sacrifice for them. The judgment below should be affirmed.

## INTEREST OF THE AMICUS

The State of North Carolina files this amicus brief in support of plaintiff-appellee under Appellate Rule 29(a)(2). The State has a strong interest in this appeal. First, the appeal implicates the State's interest in protecting North Carolina consumers by ensuring that the millions of North Carolinians who regularly use rideshare services have meaningful protections against and recovery for harms committed by rideshare drivers. Second, the State has an interest in ensuring the correct application of North Carolina law. Uber asks this Court to misapply our common carrier law, which would have negative consequences in other cases applying that law in federal courts in this circuit.

## ARGUMENT

### I. Uber Is A Common Carrier Under North Carolina Law.

North Carolina courts "extend the application of the common law to the new conditions of advancing civilization" while adhering to "known" "principles." *Briscoe v. Henderson Lighting & Power Co.*, 62

S.E. 600, 607 (N.C. 1908). In construing the common law, North Carolina courts examine their own precedent, consult non-binding authorities where persuasive, and weigh "social and policy considerations" as appropriate. *See Nelson v. Freeland*, 507 S.E.2d 882, 888-89 (N.C. 1998) (Wynn, J.); *see also id.* at 883.

Here, the relevant common law rule is the common carrier doctrine. In North Carolina, a "common carrier is one who holds himself out to the public as engaged in the public business of transporting persons for compensation from place to place, offering his services to such of the public generally as choose to employ him and pay his charges." *Jackson v. Stancil*, 116 S.E.2d 817, 824 (N.C. 1960) (cleaned up). A common carrier stands in contrast to a contract or private carrier, which "makes an individual contract in a particular instance for the carriage to a certain destination" such that "[e]ach act of transportation is a separate and individual act." *Id.* (cleaned up).

Applying this distinction to Uber is straightforward. Uber provides the public with rides to their destination. Uber has modernized how passengers hail a ride, but the essential service remains the same.

### A. Uber holds itself out to the public as a transportation provider.

A common carrier "holds [itself] out to the public" as being in the business of transporting people. *Id.* "The holding out is not a formal matter, but consists of conduct naturally inducing a belief in the minds of the public" that "service is available to those who may wish to use it." *Id.* at 825 (cleaned up).

Uber plainly meets this test. The public literally buys rides from Uber. They open the Uber app, select their destination, and accept the price and driver that Uber offers. Riders do not use Uber to call a particular driver—they call an Uber. Uber then monitors the ride for signs of trouble, like prolonged stops or veering off course. If a rider experiences problems, they contact Uber through Uber's app or website, and Uber decides how to respond. At the end of the trip, the rider pays Uber directly, and Uber provides a receipt. *See* Appellee Br. 11-12.

From the public's perspective, Uber's service is thus materially indistinguishable from "a technologically advanced taxicab company." *See In re Grice*, 974 F.3d 950, 957 (9th Cir. 2020) (cleaned up). And North Carolina courts have long held that taxicab operators are common carriers. *See, e.g.*, *Hardy v. Ingram*, 126 S.E.2d 55, 56 (N.C.

1962); *Smith v. Goforth*, 209 S.E.2d 887, 888 (N.C. Ct. App. 1974).

Uber's public statements provide further support. Uber has long "freely described itself as a transportation company." *Crawford v. Uber Techs., Inc.*, 2021 WL 3810259, at *5 (N.D. Cal. Aug. 26, 2021). The record in this case is replete with public statements from Uber confirming that it is in the transportation business. *See* Appellee Br. 20-21, 23. This "holding out" is the governing test. *See Jackson*, 116 S.E.2d at 824-25. "Uber's claim that it is 'not a transportation company' strains credulity, given the company *advertises itself* as a 'transportation system.'" *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1143 (N.D. Cal. 2020).

**B. Uber is a "carrier" under North Carolina law.**

Uber does not meaningfully dispute that it holds itself out as a provider of transportation services. Instead, Uber's lead argument is that, regardless of how it holds itself out, it is in fact merely an app that connects riders with drivers. Uber Br. 25-27. "A number of cases have considered contentions that ride-sharing companies such as Lyft and Uber are in the business solely of creating technological platforms, not of transporting passengers, and have dismissed them out of hand."

*People v. Uber Techs., Inc.*, 270 Cal. Rptr. 3d 290, 311 (Cal. Ct. App. 2020). This Court should do the same. Uber provides transportation through a model wherein drivers use their own cars, create their own schedules, and decide whether to accept any given ride. But those choices about *how* Uber will provide transportation services do not change the "substance of [Uber's] operations." Uber Br. 28.

Uber notes that it owns no vehicles, Uber Br. 24, but it cites no case holding that a transportation service provider using vehicles it does not own can sidestep liability as a common carrier. The law is to the contrary. *See* Appellee Br. 24; *Am. Orient Exp. Ry. Co. v. Surface Transp. Bd.*, 484 F.3d 554, 556 (D.C. Cir. 2007) (rejecting argument that Orient Express "cannot provide 'railroad transportation'" because "it does not own tracks").

Uber also argues that it cannot be a common carrier because it does not "control operational details of rides, such as the route." Uber Br. 24. But taxi drivers likewise decide their own route. And Uber ignores the many ways that it wields significant control over Uber rides. *See Crawford*, 2021 WL 3810259, at *5 (listing ways Uber controls Uber trips); *Drammeh v. Uber Techs., Inc.*, 2024 WL 4003548, at *2 (9th Cir.

Aug. 30, 2024) (listing others); *Murray v. Uber Techs., Inc.*, 486 F. Supp. 3d 468, 475-76 (D. Mass. 2020) (listing more). The record confirms that control here. *See* Appellee Br. 11-12, 25; Uber Br. 10-11.

More broadly, Uber lacks additional control only because it has chosen not to exercise it. Uber drivers "operate within a market that Uber itself created; Uber drivers do not exist independent of Uber's app." *Equal Rts. Ctr. v. Uber Techs., Inc.*, 525 F. Supp. 3d 62, 84 (D.D.C. 2021). "Uber is much more than a mere 'conduit' between riders and drivers," and its decision to delegate some aspects of Uber rides to Uber drivers does not mean Uber is no longer a "carrier" at all. *Id.* at 85.

Finally, Uber points to its contractual fine print. Uber Br. 27. But common carriers' "fixed legal character" is "to be determined by the nature of their business, not by the contract they made," and cannot "be thrown off by any declaration or stipulation that they should not be considered such carriers." *Bank of Ky. v. Adams Express Co.*, 93 U.S. 174, 181 (1876); *see also Jackson*, 116 S.E.2d at 824 ("[I]t is not what the carrier declares himself to be but is what the facts and circumstances show him to be."). Uber's assertions do not change "the

way it operates" or the fact that "it has held itself out to the public as a transportation company." *Crawford*, 2021 WL 3810259, at *5.

Moreover, North Carolina public policy does not permit a common carrier to contract against liability for damages caused by its agents' breaches of its duties of care. *See Hill v. Carolina Freight Carriers Corp.*, 71 S.E.2d 133, 137 (N.C. 1952); *Fortson v. McClellan*, 508 S.E.2d 549, 551 (N.C. Ct. App. 1998). Even where otherwise permitted, provisions purporting to limit liability for deviations from that duty require "explicit language clearly indicating that such was the intent of the parties." *Hill*, 71 S.E.2d at 137. Uber identifies no such language.

In short, when "the focus is on the substance of what [Uber] actually does, … it is clear that Uber is most certainly a transportation company, albeit a technologically sophisticated one." *O'Connor v. Uber Techs., Inc.*, 82 F. Supp. 3d 1133, 1141 (N.D. Cal. 2015).

### C. Uber offers its services indifferently to the public.

Common carriers are open "as a business to carry for all people indifferently," whereas private carriers "[e]ngag[e] in the operation … merely as a casual or occasional undertaking." *Jackson*, 116 S.E.2d at 824. In other words, common carriers presumptively will transport

anyone, while a private carrier "does not furnish transportation indiscriminately but furnishes it only to those with whom he sees fit to contract." *State ex rel. Utils. Comm'n v. Gulf-Atl. Towing Corp.* ("*GATCO*"), 110 S.E.2d 886, 890 (N.C. 1959).

Uber falls in the former category. None of the factors to which Uber points transforms it from a company that transports people as its "regular business" into one that does so through only "separate and individual act[s]." *Jackson*, 116 S.E.2d at 824.

*First*, Uber's registration requirement does not render it a private carrier. A common carrier cannot escape its common law obligations by "putatively limit[ing]" its services "to members" if "membership requires nothing more than signing up." *Flytenow, Inc. v. F.A.A.*, 808 F.3d 882, 892 (D.C. Cir. 2015). "While true that Uber is only accessible to registered users, any person with a smart phone can download the app." *Hoffman v. Silverio-Delrosar*, 2021 WL 6091107, at *6 (D.N.J. Dec. 23, 2021). Uber accounts are thus how Uber "offer[s] [its] services to … the public generally." *Jackson*, 116 S.E.2d at 824.

Moreover, common carrier liability attaches even when only a fraction of the public uses a company's transportation services. For

example, "a taxicab company [is] a common carrier offering its services to the public even though the service [is], by contract, limited to the patrons of several hotels and a railroad station." *State ex rel. Utils. Comm'n v. Simpson*, 246 S.E.2d 753, 756 (N.C. 1978). If that meaningful limit does not render a taxi company a private carrier, then merely requiring users to download an app does not either. The question is whether the carrier offers services to a subset of the public "sufficient … to clothe the operation with a public interest." *Id.* at 757. Uber certainly does. *See* Appellee Br. 12 (Uber provides over a billion U.S. rides every year).

*Second*, neither Uber's reservation of the power to deny platform access nor its exercise of that power changes its core business of providing transportation to the public. In determining whether a company is a common carrier, "the important thing is what it does." *Terminal Taxicab Co. v. Kutz*, 241 U.S. 252, 254 (1916). A company that "holds itself out to the public as being a common carrier" cannot "divest itself of that character" by reserving and occasionally exercising a "right to refuse." *Claypool v. Lightning Delivery Co.*, 299 P. 126, 128 (Ariz. 1931). That is particularly so when "such reservation … is …

merely for the purpose of divesting itself of the character and responsibility of a common carrier." *Id.*

Here, Uber does not purport to "refuse" its services "arbitrarily." *Kutz*, 241 U.S. at 256. Nor does it purport to consider a range of ride- or rider-specific variables before deciding whether to offer transportation services in any given case. Uber does not transport riders "only by contract specifically negotiated with the particular" passenger, acting as a "judge of those it wants to haul for, and those it does not want to haul for," based on individual factors like the negotiated price or potential effects on other customers. *GATCO*, 110 S.E.2d at 891. Uber is open for business to everyone.

To be sure, Uber in practice appears to exclude some individual riders who present a risk of inappropriate or unsafe behavior. *See* Appellee Br. 29-30 (discussing record evidence). That has no effect on Uber's status as a common carrier. Over a century ago, the North Carolina Supreme Court recognized that "[c]ommon carriers have a right, and in some cases it is their duty, to refuse" to transport a passenger who is likely "to be dangerous or annoying." *Story v. Norfolk & S.R. Co.*, 45 S.E. 349, 350 (N.C. 1903). Uber might have reserved a

hypothetical "unqualified right to deny access 'at any time for any reason,'" Uber Br. 33, but in practice it exercises only the same right to exclude that common carriers have long exercised.

*Third*, individual drivers' ability to decline a ride request does not change the public nature of the service that *Uber* offers. "If a driver declines the request, it is offered to another driver." *Capriole v. Uber Techs., Inc.*, 991 F.3d 339, 341 (1st Cir. 2021). Uber thus continues to answer the public's "call and demand," even though a particular driver may decline a particular ride. *State ex rel. Utils. Comm'n v. Am. Courier Corp.*, 174 S.E.2d 814, 816 (N.C. Ct. App. 1970).

**D. Uber offers transportation on a uniform tariff.**

Uber's final argument—that it is not a common carrier because its prices change frequently depending on "real-time and historical marketplace conditions," Uber Br. 35—misunderstands the law three times over.

*First*, the common law's requirement that a common carrier impose a "uniform tariff" is not defined in a vacuum, but rather in contradistinction to individually negotiated prices. Common carriers charge a "uniform tariff," *Jackson*, 116 S.E.2d at 825, while private

carriers charge a price that is "specifically negotiated" with each passenger, *GATCO*, 110 S.E.2d at 891. *See also State ex rel. Utils. Comm'n v. Tar Heel Indus., Inc.*, 334 S.E.2d 396, 399 (N.C. Ct. App. 1985) ("[I]ndividually negotiated terms … are not compatible with public service as a common carrier."). A carrier who is "willing[] to perform only on terms and conditions then and there negotiated" is not a common carrier because there is "no more positive way of revealing the determination not to take on the obligations of a public utility." *Home Ins. Co. v. Riddell*, 252 F.2d 1, 5 (5th Cir. 1958).

Uber does not negotiate its prices. Its prices "come[] from a dynamic pricing algorithm incorporating multiple real-time and historical variables" that have nothing to do with the rider. Uber Br. 9. When all the variables are the same, all riders pay the same price.

Uber suggests that there is negotiation because a "rider presented with a proposed fare need not accept it; she can wait to see whether the fare drops as market conditions shift." Uber Br. 35; *see also* Uber Br. 9 (calling prices "*proposed* fares"); Uber Br. 34 (suggesting its "dynamic pricing model" leads to "individualized agreements"). That is true of every purchase and is not negotiation. Some people choose not to fly

when flights are too expensive; airlines are still common carriers. The relevant point is that members of the public cannot talk to Uber and try to "come together on the terms and agree on … the price they will pay." *GATCO*, 110 S.E.2d at 891. They can either pay the same price that identically situated persons pay or decline the service.

*Second*, Uber erroneously argues that its prices are not "fixed" in the relevant sense because its fares "fluctuate." Uber Br. 35. That too is irrelevant. A company's status as a common carrier does not depend on how often its equally applicable prices change—it depends on whether there is "an equality of charge to all persons for similar services" at any given time. *Interstate Com. Comm'n v. Balt. & Ohio R.R. Co.*, 145 U.S. 263, 276 (1892).

Uber's proposed rule—that "fixed tariffs" means prices that are the same for everyone, all the time—is contrary to North Carolina law. Our Supreme Court has held that a shipper charged a "uniform tariff" despite offering a "dedicated rate" that "result[ed] in lower charges for larger shippers." *State ex rel. Utils. Comm'n v. Bird Oil Co.*, 273 S.E.2d 232, 239 (N.C. 1981). That "dedicated rate [was] equally available, and on the same terms, to all," so there was "nothing inconsistent between

the dedicated rate structure and the duty of common carriers to hold themselves out to the general public and provide service impartially to all persons requesting service." *Id.*

Uber cites no case holding that a common carrier becomes a private carrier by frequently changing its prices. In *Riddell*, for example, the defendant was a private carrier because he "conditioned his willingness to carry upon the negotiation of a satisfactory price," not because he frequently updated the prices he charged everyone. 252 F.2d at 3. Uber also never explains why such a rule makes sense—a transportation services provider is no less "clothed with a public interest" when it uses a pricing algorithm. *Munn v. Illinois*, 94 U.S. 113, 126 (1876).

*Finally*, non-discriminatory pricing is a common law obligation that attaches to entities determined to be common carriers; it is not a criterion used to make that determination. Uber argues that it is not a common carrier because it does not offer prices on terms that are equally available to all. Uber Br. 36. If Uber means to admit that it arbitrarily charges different rates to similarly situated people, then it is likely admitting to abdicating its common law duties.

"To be a common carrier, a company need only, in practice, serve the public indiscriminately and not make individualized decisions, in particular cases, whether and on what terms to deal." *Am. Orient*, 484 F.3d at 557 (cleaned up). Legal obligations attach to that status, including not to engage in "unreasonable discrimination … between those receiving the same kind and degree of service." *Bird Oil*, 273 S.E.2d at 237; *see also Tar Heel*, 334 S.E.2d at 399 ("[A] common carrier cannot legally operate as a contract carrier.").

If carriers "could at will favor certain individuals with low rates, and charge others exorbitantly high, or refuse service altogether, the business interests and the domestic comfort of every man would be at their mercy." *Griffin v. Goldsboro Water Co.*, 30 S.E. 319, 320 (N.C. 1898). Avoiding arbitrary price discrimination is thus among the "duties and responsibilities of the common carrier." *York Co. v. Cent. R.R.*, 70 U.S. 107, 112 (1865); *see also Mo. Pac. R. Co. v. Larabee Flour Mills Co.*, 211 U.S. 612, 620 (1909) ("[A] party engaging in the business of a common carrier is bound to treat all shippers alike."). Common carriers violate their common law duties when they charge prices that are not "equally available, and on the same terms, to all." *Bird Oil*, 273

S.E.2d at 239. They do not stop being common carriers.

## II. North Carolina Statutes Do Not Displace The Common Law Governing Common Carriers' Tort Duties.

The people of North Carolina have not displaced this common law framework or surrendered their right to recover from Uber for injuries caused by Uber drivers. Uber cites North Carolina's transportation network company ("TNC") statute, N.C. Gen. Stat. §§ 20-280.1 to -280.10, and the regulation of "common carriers" in the Public Utilities Act, N.C. Gen. Stat. §§ 62-1 to -352. Uber Br. 37-45. Uber misunderstands the interaction between these statutes and the common law. The TNC statute and the Public Utilities Act merely impose different sets of regulatory obligations on certain statutorily defined entities and identify the state agency charged with ensuring compliance. The statutes say nothing about whether Uber is a common carrier at common law or what its concomitant duties of care include.

### A. The TNC statute does not displace the common law because it says nothing about the common law.

It is a bedrock principle of North Carolina law that "[t]he common law … is changed only where the [statute]'s departure from common law is clearly expressed." *Terry v. Pub. Serv. Co. of N.C., Inc.*, 898

S.E.2d 648, 652 (N.C. 2024); *see also Lowe v. Harris*, 17 S.E. 539, 544 (N.C. 1893) (Shepherd, C.J., concurring) ("[I]f the legislature intended to abrogate these [common law] rules, in whole or in part, it should have expressed such intention in the clearest and most unmistakable manner."). After all, "the General Assembly repeatedly has demonstrated that it knows how to be explicit when it intends to repeal or amend the common law." *Dickson v. Rucho*, 737 S.E.2d 362, 370 (N.C. 2013). Any such purported abrogation of the common law is "to [be] construed strictly." *Price v. Edwards*, 101 S.E. 33, 37 (N.C. 1919).

North Carolina's TNC statute comes nowhere near expressly overriding the common law. The TNC statute imposes a suite of regulatory obligations on TNCs, defined as "[a]ny person that uses an online-enabled application or platform to connect passengers with TNC drivers who provide prearranged transportation services." N.C. Gen. Stat. § 20-280.1(6). For example, TNCs must disclose their "fee calculation method," *id.* § 20-280.2(a)(1); obtain a permit, *id.* § 20-280.3; maintain insurance, *id.* § 20-280.4; require drivers to have their vehicles annually inspected, *id.* § 20-280.5(a); provide certain driver information to riders, *id.* § 20-280.5(b); and conduct background checks

on drivers, *id.* § 20-280.6. The statute also authorizes the Division of Motor Vehicles to implement these laws, *id.* § 20-280.7; creates a presumption that TNC drivers are independent contractors, *id.* § 20-280.8; permits airports to oversee certain aspects of TNC operations at their facilities, *id.* § 20-280.9; and bars local regulation of TNC services and contracts that contradict the statute, *id.* § 20-280.10.

Nothing in the TNC statute, however, precludes TNCs from being common carriers under the common law. Nothing purports to supplant the common law rule that common carriers owe their passengers nondelegable duties of care. Indeed, the statute says nothing at all about tort liability. The TNC law is thus irrelevant here. If an entity "uses an online-enabled application or platform to connect passengers with TNC drivers," *id.* § 20-280.1(6), and "holds itself out to the public as engaged in the public business of transporting persons for compensation from place to place," *Jackson*, 116 S.E.2d at 824 (cleaned up), then it is *both* a TNC *and* a common carrier.

If the General Assembly wanted to supplant the common law and provide by statute that TNCs are not common carriers, it would have done so expressly. Similar statutes from Florida, Pennsylvania, and

Texas expressly state that TNCs are not common carriers. *See* Fla. Stat. § 627.748(2) ("A TNC or TNC driver is not a common carrier …."); 66 Pa. Cons. Stat. § 2603(a), (b)(4) ("Laws and regulations imposing a greater standard of care on motor carriers" shall "not apply to transportation network companies."); Tex. Occ. Code § 2402.002 ("Transportation network companies ... are not common carriers…."). These statutes show how a state legislature might expressly supplant its state's common law. *See In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 745 F. Supp. 3d 869, 897 (N.D. Cal. 2024); *Doe A.F. v. Lyft, Inc.*, 2024 WL 3497886, at *5 n.10 (E.D. Pa. July 19, 2024). North Carolina's TNC statute does not.

### B. Separate regulatory treatment of statutorily defined "common carriers" says nothing about common law duties of care.

Because Uber can point to no statute expressly providing that TNCs are not common carriers, it asks the Court to infer from various ancillary provisions that the General Assembly must have meant to supplant the common law. The upshot is that Uber believes that TNCs cannot be common carriers under the common law because North Carolina statutes impose separate regulatory obligations on a narrow

set of statutorily defined "common carriers." *See* Uber Br. 39-42. That argument fails because these statutes do not purport to erase the common law test for common carrier status. They merely use the phrase to define which companies have which set of statutory obligations, and what agency administers those obligations.

Uber cites the Public Utilities Act, N.C. Gen. Stat. §§ 62-1 to -352. Uber Br. 41-42. That Act charges the Public Utilities Commission with regulating various "public utilities generally," including "their rates, services, and operations." *Id.* § 62-2(b). The Act specifically covers certain types of "motor carriers," *id.* §§ 62-259 to -289, that provide "highway transportation," *id.* § 62-259. The Act's obligations include obtaining a certificate from the Utilities Commission, *see id.* § 62-262(a), (e); *id.* § 62-262.1; meeting liability insurance thresholds, *id.* § 62-268; submitting to background checks, *id.* § 62-273.1; and charging Commission-approved rates, *id.* § 62-139. These requirements are similar to those imposed by the TNC statute. *See supra* Part II.A. Nothing in the Public Utilities Act suggests that only the companies subject to the Act's obligations can be "common carriers" at common law. Nor does the Act suggest that only statutory common carriers bear

the tort duties of common carriers at common law.

In fact, the structure of the Act confirms that it is not intended to supplant the common law. The Act expressly excludes from the statutory definition of "common carrier" quintessential common law common carriers. Most directly relevant, taxis are excluded, *see* N.C. Gen. Stat. § 62-260(a)(2), even though our state courts have left no doubt that "[t]hose who operate taxicabs are common carriers," *Hardy*, 126 S.E.2d at 56. Notably, our state courts concluded that taxis are common law common carriers even *after* passage of the statute that exempted taxis from regulation by the Utilities Commission. *See* Bus Act of 1949, ch. 1132, 1949 N.C. Sess. Laws 1325, 1328, *available at* https://bit.ly/4BVEbaV.

The Act also excludes trolley buses and rail carriers from the statutory definition of "common carrier," *see* N.C. Gen. Stat. §§ 62-3(6), 62-260(a)(5), although both are prototypical common carriers, *see Woods v. N.C. Pub. Serv. Co.*, 94 S.E. 459, 461 (N.C. 1917) (street railway); *Loggins v. S. Pub. Utils. Co.*, 106 S.E. 822, 823 (N.C. 1921) (trolley cars); *Hough-Wylie Co. v. Lucas*, 72 S.E.2d 11, 15 (N.C. 1952) (rail carriers). Similarly, ferries are common law common carriers, *see*

*Wilson v. Shulkin*, 51 N.C. 375 (1859), but some are regulated by local Ferry Transportation Authorities rather than the Utilities Commission, N.C. Gen. Stat. § 160A-686(b).

The Public Utilities Act thus is not intended to redefine what entities are subject to the tort duties of common carriers at common law. The Act instead merely uses the term "common carrier" as a shorthand to define the regulatory obligations of different companies. Many exempted carriers are subject to regulations under other statutes or regulatory bodies. *See* N.C. Gen. Stat § 160A-304 (authorizing local regulation of for-hire vehicles such as taxicabs); *id.* § 160A-685(c)(18) (same for ferries). "[T]he primary object in enacting [the exemptions] was to make certain" that these operations were "completely free from supervision or regulation by the [Utilities] Commission." *State ex rel. N.C. Utils. Comm'n v. McKinnon*, 118 S.E.2d 134, 142 (N.C. 1961). Nothing in the Public Utilities Act or its exemptions clearly displaces ordinary common law rules.

Courts have consistently rejected Uber's arguments with respect to similar statutes. Separate common carrier and TNC statutory frameworks merely "clarif[y] that Uber is not bound by" the "regulatory

requirements" for statutory common carriers; it "[f]ar from conclusively resolv[es] the issue of what standard applies to Uber's tort liability." *Murray*, 486 F. Supp. 3d at 475. Where "[t]he TNC [statute] does not address the common carrier duty, or more generally, any tort liability," it has no "impact on the common law common carrier duty." *Hoffman v. Silverio-Delrosar*, 2021 WL 2434064, at *4 (D.N.J. June 15, 2021).

Uber's strained reading of North Carolina's TNC statute and Public Utilities Act cannot supply what the General Assembly plainly omitted: any provision disqualifying TNCs from being common carriers under the common law.

## III. Under North Carolina Law, Common Carriers Are Liable For Harms To Passengers Caused By The Intentional Torts Of Their Independent Contractors.

Common carriers have a duty to transport passengers with the "highest degree of care for their safety." *Mann v. Va. Dare Transp. Co.*, 198 S.E.2d 558, 565 (N.C. 1973). There is no dispute that common carriers are thus liable for their agents' assaults. *See Hairston v. Atl. Greyhound Corp.*, 18 S.E.2d 166, 170 (N.C. 1942); *accord Connell v. Call-A-Cab, Inc.*, 937 So. 2d 71, 72-74 (Ala. 2006). Uber attempts to circumvent this duty in two ways. First, Uber argues that this

nondelegable duty attaches only to common carriers operating under a formal public franchise. Uber Br. 48-51. That rule has no support and is inconsistent with North Carolina cases. Second, Uber argues that this duty can be delegated to independent contractors, just not employees. Uber Br. 52-56. The North Carolina Supreme Court has rejected that argument. *See Mann*, 198 S.E.2d at 565, 569.

### A. A common carrier's nondelegable duty to provide safe transport does not depend on a public franchise.

Uber argues that common carriers are free to delegate their heightened duties of care to independent contractors unless they operate under a formal public franchise. Uber Br. 48-51. Uber cites a number of cases mentioning the public franchise, but none holding that nondelegable duties arise only when a common carrier operates under a franchise. Uber instead contends that "the franchise is what provides the whole justification for the nondelegable duty." Uber Br. 49. North Carolina law is to the contrary.

Nondelegable duties arise when "the responsibility is so important to the community that the employer should not be permitted to transfer it to another." *Medley v. N.C. Dep't of Corr.*, 412 S.E.2d 654, 657 (N.C. 1992). A public franchise is relevant to that question, but not

dispositive. Many nondelegable duties have nothing to do with a state-issued franchise. *See, e.g.*, *Woodson v. Rowland*, 407 S.E.2d 222, 235 (N.C. 1991) ("One who employs an independent contractor to perform an inherently dangerous activity may not delegate the duty to provide for the safety of others."); *Page v. Sloan*, 190 S.E.2d 189, 193 (N.C. 1972) (hotel liable for independent contractor's negligent electrical work); *Hendricks v. Leslie Fay, Inc.*, 159 S.E.2d 362, 367 (N.C. 1968) (employer liable for independent contractor's false arrest of employee); *Dockery v. World of Mirth Shows, Inc.*, 142 S.E.2d 29, 33 (N.C. 1965) (amusement park had "nondelegable duty to maintain a reasonably safe place for patrons"); *Brooks v. BCF Piping, Inc.*, 426 S.E.2d 282, 286 (N.C. Ct. App. 1993) (employer cannot delegate obligation to comply with occupational safety laws).

Regardless of whether they operate under a formal franchise, "[c]ommon carriers exercise a sort of public office, and have duties to perform in which the public is interested." *Munn*, 94 U.S. at 130. Common carriers offer an "invitation to the public" to use their services. *Dockery*, 142 S.E.2d at 34; *see also Page*, 190 S.E.2d at 192 (discussing nondelegable duty of one who owns "land which he holds open to the

entry of the public as his place of business"). And "the public has an important stake in having the public transportation of persons be as safe as possible." *Lamb v. B & B Amusements Corp.*, 869 P.2d 926, 930 (Utah 1993). The heightened standard of care thus turns "on the nature of the *business* of carriage," *Mount Pleasant Indep. Sch. Dist. v. Est. of Lindburg*, 766 S.W.2d 208, 213 (Tex. 1989), not on whether the carrier's public obligations are accompanied by a public franchise.

Because common carriers' business is "clothed with a public interest," they "must submit to be controlled by the public for the common good." *Munn*, 94 U.S. at 126. "The policy of the law which is ever solicitous for the protection of human life, requires common-carriers, who have charge of the safety of passengers to use a high degree of care to guard against probable injury." *Lambeth v. N.C. R.R. Co.*, 66 N.C. 494, 498 (N.C. 1872). After all, "the passenger and his baggage, during the transit, are in the possession of, and under the immediate supervision and control of, the carrier's agents." *Daniel v. Petersburg R. Co.*, 23 S.E. 327, 327 (N.C. 1895); *see also Derwort v. Loomer*, 21 Conn. 245, 253-54 (Conn. 1851) (common carriers are uniquely responsible for passengers, who are "locked up, as it were, in

the coach or rail-car, ignorant, helpless, and having no eyes, or ears, or power to guard against danger").

The importance of this public duty to ensure the safety of passengers is why common carriers cannot delegate it to independent contractors. If anything, a common carrier's duty is far *more* important than "an innkeeper's duty to use due care for the safety of his guests," which "is a responsibility so important to the public that he should not be permitted to transfer it to another." *Page*, 190 S.E.2d at 192. The public franchise formalizes this public duty, but it is not a prerequisite.

### B. A common carrier's duty to its passengers cannot be delegated to independent contractors.

A common carrier's duty of care to its passengers is "nondelegable." *Mann*, 198 S.E.2d at 565 (collecting cases). "[T]he cases of 'non-delegable duty' hold the employer liable for the negligence of the contractor, although he himself has done everything that could reasonably be required of him." *Hendricks*, 159 S.E.2d at 366. Uber asserts that the district court "invent[ed]" this "nondelegable duty." Uber Br. 46. That is incorrect.

North Carolina's Supreme Court has held that a "passenger who sustains an injury by reason of the fact that the obligatory measure of

care was not exercised is entitled to hold the carrier responsible, although the conditions or occurrences which caused the injury resulted from the negligence of an independent contractor." *Mann*, 198 S.E.2d at 565. In *Mann*, the plaintiffs were injured when their bus ran off the road, allegedly due to a faulty steering mechanism. *Id.* at 566. They sued "Transportation Company, a common carrier" that operated the bus, *id.* at 565, as well as "Coach Company, an independent contractor" that "contracted with Transportation Company to furnish it buses," *id.* at 569. The Court held that Transportation Company "could not delegate to Coach Company its duty to use the highest degree of care to provide safe buses," *id.*, so Transportation Company "would be liable" if "the bus which Coach Company delivered … contained a pre-existing defect," *id.* at 566.

Uber misses this point, insisting that its drivers are "strangers" rather than "agents." Uber Br. 52, 55. It is true that a carrier is responsible for harm to its passengers only "if the conductor, or other servant, … could … have prevented it, but failed to do so." *Pride v. Piedmont & N. Ry. Co.*, 97 S.E. 418, 419 (N.C. 1918). But the "nondelegable duty theory is an exception to the rule of nonliability by a

principal for the work of independent contractors" such that an independent contractor "is as a matter of law an agent for purposes of applying the doctrine of *respondeat superior*." *Medley*, 412 S.E.2d at 657, 659. Because independent contractors are a common carrier's "servant[s]" or agents, *Hendricks*, 159 S.E.2d at 365-66, the question is whether the Uber driver who committed the assault could have prevented it, *see Hairston*, 18 S.E.2d at 170. Of course he could have.

Uber objects that it does not have sufficient control over its independent contractors to warrant holding it liable for the torts of its drivers. Uber Br. 54. But duties are nondelegable precisely because they "are of such importance that employers should not be able to escape liability merely by hiring others to perform them." *Medley*, 412 S.E.2d at 657. Choosing to hire independent contractors over whom a carrier lacks control does not "get rid" of that duty. *Id.* Nor does it matter whether its driver's assault was "outside the scope" of his duties, because North Carolina holds a carrier liable for an assault by its on-duty agent "whether within the line of his employment or not." *Hairston*, 18 S.E.2d at 170.

Moreover, Uber is free to seek recovery from its drivers who

commit intentional torts. *See Mann*, 198 S.E.2d at 569. The common law merely allocates the risk of insolvent independent contractors to the common carrier rather than injured passengers. After all, injured Uber riders likewise cannot control Uber drivers' behavior, and they entrusted their physical safety to Uber.

Nor does holding Uber liable for the torts of its drivers make Uber an "insurer of the safety of passengers." Uber Br. 52. Common carriers are only liable for injuries to passengers that are caused by deviations from the governing standard of care. *See Hollingsworth v. Skelding*, 55 S.E. 212, 212-13 (N.C. 1906); *White v. Chappell*, 14 S.E.2d 843, 848 (N.C. 1941) (bus company not liable for passenger's injuries suffered after disembarking). By contrast, under the common law, common carriers of "inanimate objects" are "insurers," liable for all damage apart from "act[s] of God, or of the public enemy." *Hollingsworth*, 55 S.E. at 212-13. Because Uber is only liable for passenger injuries if it or its agents (including independent contractors) breach their duties, Uber is not an insurer of passenger safety.

At bottom, Uber's argument is that it would be better policy to allow common carriers to delegate their duties of care to independent

contractors, leaving injured riders to seek recovery from the driver alone, with no meaningful prospect of recovery. The people of North Carolina have rejected Uber's position and retained the common law rule holding taxi companies and Uber alike to a higher, nondelegable standard. Uber cannot shirk that duty here.

## CONCLUSION

The State of North Carolina respectfully requests the Court affirm the judgment below.

Respectfully submitted, this the 12th day of November, 2026.


JEFF JACKSON
Attorney General

/s/ Nicholas S. Brod
Nicholas S. Brod
Solicitor General

Taylor Brennan
Solicitor General Fellow

N.C. Department of Justice
Post Office Box 629
Raleigh, NC 27602
(919) 716-6400

*Counsel for amicus curiae the State of North Carolina*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) because it contains 6,405 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) & (6) because it has been prepared in a proportionally spaced typeface: 14-point Century Schoolbook font.

Respectfully submitted, this the 12th day of November, 2026.

/s/ Nicholas S. Brod
Nicholas S. Brod

## CERTIFICATE OF SERVICE

I certify that on November 12, 2026, I filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

Respectfully submitted, this the 12th day of November, 2026.

/s/ Nicholas S. Brod
Nicholas S. Brod